AO 91 (Rev. 11/11)  Criminal Complaint

████████████████████

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>BRENDAN JACY TATUM, and<br>JOSEPH HUFFAKER<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**

Mar 09 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

Case No.  3-21-70422 MAG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  August 2016 to February 20, 2018  in the county of  San Francisco  in the
Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951 | Conspiracy to Commit Extortion Under Color of Official Right (TATUM and HUFFAKER); |
| 18 U.S.C. § 1519 | Falsifying Records in a Federal Investigation (TATUM); |
| 26 U.S.C. § 7201 | Tax Evasion (TATUM) |

This criminal complaint is based on these facts:

See Affidavit.

☑ Continued on the attached sheet.

/s/  William Bradford Roberts
*Complainant's signature*

FBI Special Agent William Bradford Roberts
*Printed name and title*

Approved as to form ____/s/_____
AUSA Cynthia Frey

Sworn to before me by telephone.

Date:     03/09/2021

*Judge's signature*

City and state:     San Francisco, CA

Sallie Kim, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, William B. Roberts, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state the following:

## I.   OVERVIEW AND AGENT BACKGROUND

1.     I make this Affidavit in support of a three count Criminal Complaint against Brendon Jacy Tatum ("TATUM") and Joseph Huffaker ("HUFFAKER") for:

   a.  Conspiracy to Commit Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951.  TATUM and HUFFAKER, agents of the City of Rohnert Park's Department of Public Safety ("RPDPS"), knowingly conspired between at least on or about December 5, 2017 and December 18, 2017, to obstruct, delay, and affect in any way and degree commerce and the movement of articles and commodities in commerce by extortion, by obtaining property from victims and others, with consent induced under color of official right;

   b.  Falsifying Records in a Federal Investigation, in violation of 18 U.S.C. § 1519.  TATUM, an agent of the RPDPS, knowingly falsified records with the intent to impede, obstruct, and influence the investigation and proper administration of an investigation into the lawfulness of a RPDPS patrol stop and seizure on December 5, 2017, a matter that the defendant knew and contemplated was within the jurisdiction of Federal Bureau of Investigation, a department and agency of the United States; and

   c.  Tax Evasion, in violation of 26 U.S.C. § 7201, such that TATUM willfully attempted to evade income taxes due and owing by him to the United States of America for the calendar year 2016, by preparing and causing to be prepared, and by signing and causing to be signed in the Northern District of California,

1

a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service.

For the reasons set forth below, I believe there is probable cause to believe that TATUM and HUFFAKER committed the foregoing violations of federal law.

2.     The statements contained in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses.  This affidavit summarizes such information in order to show that there is probable cause to believe that TATUM and HUFFAKER have committed the violations listed above.  This affidavit does not purport to set forth all of my knowledge about this matter, or to name all of the persons who participated in these crimes.

3.     I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been employed since March 2018.  I am assigned to the San Francisco Field Division.  As part of my duties, I investigate possible violations of federal criminal law, including public corruption and civil rights violations, as well as assist in numerous investigations related to financial crimes, healthcare fraud, counterterrorism, and counterintelligence cases.

## II.   APPLICABLE LAW

4.     Title 18, United States Code, Section 1951 provides in pertinent part:

> (a)  Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than 20 years, or both.

> (b) As used in this section – ….

> (2) The term extortion means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

5.     Title 18, United States Code, Section 1519 provides in pertinent part:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with intent to impede, obstruct, or influence the investigation or proper administration of any

matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or in contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

6.     Title 26, United States Code, Section 7201 provides:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

## III.     FACTS ESTABLISHING PROBABLE CAUSE

7.     TATUM and HUFFAKER were Rohnert Park Department of Public Safety police officers, assigned to drug interdiction work.  From August 2016 to December 2017, TATUM, acting as a uniformed police officer, extorted marijuana and cash from drivers on Highway 101 under color of official right, threatening to arrest drivers if they contested his seizures of their property, which he then kept for himself without reporting or checking into evidence.  In December 2017, TATUM and HUFFAKER, after their drug interdiction work ended, falsely impersonated agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and similarly extorted drivers for the same purposes.  With respects to the acts alleged herein, TATUM extorted at least $3,700 in cash and 60 pounds of marijuana with a value of at least $85,000, and HUFFAKER conspired with TATUM in extorting at least portion of the marijuana. After the FBI investigation into their conduct became public, TATUM falsified a police report to cover his tracks.  Additionally, TATUM evaded his income taxes, failing to report at least $443,059 in cash deposits for the tax year 2016, for which there is probable cause to believe were derived from his extortion scheme.

### A.     Background and Summary

8.     The City of Rohnert Park is a city located in Sonoma County, California.  RPDPS is a department of the City of Rohnert Park.  RPDPS consists of a Police Services Patrol Division and Fire Services Division.

9.      TATUM was employed with RPDPS between 2003 and 2018.  HUFFAKER was employed with RPDPS between 2012 and 2019.  Between July 2015 and August 20, 2017, and again after February 4, 2018, TATUM was a Public Safety Sergeant in the Police Services Patrol Division.  RPDPS Public Safety Officers, regardless of what division they were assigned, were able to work overtime shifts in either in the Police Services Patrol Division or the Fire Services Division.

10.      The interdiction team operated between at least 2014 through approximately 2017.  TATUM and HUFFAKER were members of that interdiction team and participated in the activities of the team at various times between 2015 and the end of 2016.  In 2016, the team was headed by TATUM and was overseen by Commander J.T., who reported to the RPDPS Chief, B.M.  The interdiction team conducted traffic stops on vehicles in an effort to seize illegal drugs and its operations were in addition to the team members' normal duties.  As such, the time spent on interdiction operations was considered overtime and interdiction team members were required to notate their time sheets accordingly.  The interdiction team began operating within the Rohnert Park city limits.  At some point thereafter, the interdiction team began operating along U.S. Highway 101 from Rohnert Park to points near Cloverdale, California, a city located approximately 40 miles north of Rohnert Park, and even in Mendocino County near the Sonoma border.  The interdiction team's operations were subject to the same policies and procedures in place for RPDPS in general, including policies and procedures relating to body camera usage, property and evidence packaging and destruction, asset seizure and forfeiture, and report writing, among others.

11.      The interdiction team's operations were terminated in approximately January 2017, due in part to changes in the law on marijuana prompting the District Attorney to decline to prosecute marijuana cases.  TATUM, HUFFAKER and the other interdiction team officers were informed that the interdiction team's operations were terminated.

12.      RPDPS reported that it began using body-worn cameras between 2015 and mid-2016.  Use of body-worn cameras and the policies and procedures that were in place applied to

4

all of RPDPS, including the interdiction team.  Under those policies and procedures, body-worn cameras were required to be worn and activated when officers came into contact with citizens in the performance of their official duties.  The body-worn camera was required to be activated and not be terminated until the contact had entirely concluded.  Where the body-worn camera was not activated or was terminated prior to contact entirely concluding, the officer was required to document the reasons for doing so.  All digital media from body-worn cameras was required to be downloaded at the end of the officer's shift and securely stored.

13.     Under RPDPS policies and procedures, all interdictions resulting in the seizure of narcotics and or other property or evidence, including cash, were required to be submitted to property/evidence and documented by an Evidence/Property Report and/or an Incident/Investigation Report, whether the activity related to a felony or misdemeanor.  In cases where a narcotics seizure was made, but the subject disclaimed ownership of the narcotics, the seized narcotics nevertheless were required to be submitted to property/evidence; in such instances, RPDPS records systems referred to the narcotics "as found property."  RPDPS generated case numbers sequentially regardless of the type of case.  Those case numbers were used as a reference for other official documents, including Evidence/Property Reports, Chain of Custody documents, and Incident/Investigation Reports, among other things.  Names associated with an Incident/Investigation Report were input in the RPDPS computer system and the date and time and user that inputs that data was reflected in the system.  In addition, when a user was filling in the Incident/Investigation Report fields, such information was captured in the system as "audit details," which captured the name of the user inputting the data and date and time of input into the fields.  There were no "audit details" in the system for Evidence/Property Reports prior to February 2018.

14.     In 2016, in addition to being in charge of the interdiction team, TATUM also supervised Asset Forfeiture.  Commander J.T. was the Commander in charge of asset forfeiture.  RPDPS had an asset forfeiture manual and policy that officers were required to follow.  For seizure of cash, the Asset Forfeiture Manual required that the owner be provided with a notice of

forfeiture.  All cash seized was required to be booked into evidence with a currency envelope, with a total of the amount of cash, and a list of denominations.  The currency was to be counted in the presence of two officers who were required to sign to verify the amount prior to the money being booked into the Evidence/Property room.  A photocopy of the currency envelope was required to be attached to the police report.

15.     At all relevant times, the destruction of narcotics seized by RPDPS required a destruction order signed by a judge in Sonoma County.  Once ordered for destruction, the procedure in place was to take the narcotics to an incinerator operated by Covanta Stanislaus, located in Crows Landing, California.  A property technician and a sworn officer would transport the items, provide Covanta with an inventory of items to be incinerated, and witness the destruction.  After destruction, Covanta provided proof of destruction, and the chain of custody for the evidence/property was updated by RPDPS property staff to include notes regarding the date and time of destruction.

16.     During the course of the interdiction team's operations, TATUM occasionally submitted statistics relating to the seizures, including the date of the interdiction, the officers involved, the amount of drugs and cash seized, and the corresponding case number.   While heading the interdiction team, TATUM reportedly received national awards, seized over 4,000 pounds of marijuana, 20 firearms, a dozen vehicles, and over $4,000,000.

17.     The RPDPS interdiction team did not operate in conjunction with or in cooperation with any federal agencies, such as the United States Drug Enforcement Administration or the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in relation to drug interdiction.  While other local law enforcement agencies conducted their own interdictions, RPDPS had no contracts or memoranda of understanding with other local law enforcement to coordinate interdiction efforts.  Sonoma County Sheriff's Office reported in early 2018 that it did not assist RPDPS with the destruction of marijuana.

18.     During the course of the operations of the interdiction team, on numerous occasions between at least August 2016 and December 2017, TATUM and others seized money,

marijuana, and other property from individuals that they stopped along Highway 101, without arresting these individuals, without providing a citation or asset forfeiture notice to the individuals, without filing an Incident/Investigation Report, without filing a Property/Evidence Report, without submitting the currency, marijuana and other property into the custody of the property department, without submitting the necessary asset forfeiture documents to the City of Rohnert Park, and without filing an application for a destruction order.

19.     Between on or about December 5, 2017 and December 18, 2017, TATUM and HUFFAKER, conspired to extort significant quantities of marijuana from owners with consent that was induced through color of official right, declaring to the owners that they would seize their property, and at times threatening to arrest and charge the victims, while never in fact submitting the property to RPDPS or documenting the stop or seizure.

20.     On or about February 20, 2018, after learning that Victim 5 had reported to numerous agencies, including the FBI and ATF, that his marijuana was seized by unidentified police claiming to be agents with the ATF on December 5, 2017, TATUM knowingly prepared a false Incident/Investigation Report in relation to the stop of Victim 5 (E.F.).  TATUM prepared the false Incident/Investigation Report to influence the matter that he had reason to believe the FBI and the ATF were investigating.  TATUM's actions to influence the investigation into the undocumented stop and seizure of marijuana on December 5, 2017, a matter that TATUM knew or at least contemplated was within the jurisdiction of the FBI and ATF, departments and agencies of the United States, in violation of Title 18, United States Code, Section 1519, are set forth in more detail in Count Three below.

21.     On April 15, 2017, TATUM filed a 2016 Form 1040, U.S. Individual Income Tax Return ("Form 1040") reporting gross wages in the amount of $128,992 and $29,722 in gross wages for his wife, and taxable income in the amount of $85,420.  The reported wages reconciled with his salary from the RPDPS and were not paid in cash.  Investigation by the Internal Revenue Service, Criminal Investigation ("IRS-CI") identified cash deposits into TATUM and his wife, K.T.'s, bank accounts in 2016 in the amount of $296,514.  Additional

cash deposits totaling $99,710 were made into an account in the name of TATUM's mother and stepfather.  None of the cash deposits exceeded $10,000.  Also in 2016, TATUM used cash to purchase cashier's checks that he then used to purchase a boat.  Combined, IRS-CI, identified cash receipts totaling $443,059.  TATUM did not provide evidence of the above-described cash receipts to his tax return preparer for his 2016 tax return, which was filed for both TATUM and his wife jointly.  Accordingly, TATUM willfully attempted to evade income taxes due and owing to the United States of America for the calendar year 2016, in violation of Title 26 United States Code, Section § 7201, as set forth in detail below.

**B.    Interdiction Team Traffic Stops and Seizures With Body-Worn Camera Videos, But No Documentation of the Stop or Seizure**

22.    During the course of this investigation, the investigative team reviewed all body-worn camera videos for TATUM and HUFFAKER between approximately July 7, 2016 and March 18, 2018.  During that review, agents identified a number of instances that included TATUM and other RPDPS officers, in which there was body-worn camera footage documenting an interdiction team police stop and marijuana was seized or cash and marijuana were seized, but for which there was no Incident/Investigation Report, no Evidence/Property Report, no Destruction Order, or any other documentation relating to the stop.

*August 25, 2016 Stop*

23.    For example, on August 25, 2016, TATUM and another RPDPS officer from the interdiction team (Officer 1), while on duty and on patrol, stopped Victim 1 (S.D.) on Highway 101 near Cloverdale, California.  TATUM's body-worn camera recorded a portion of this incident.  Victim 1 was driving a rental vehicle.  During the course of the stop, which was recorded in part on TATUM's body-worn camera, TATUM and Officer 1 discovered approximately $3,700 in cash, as well as roughly 14 pounds of marijuana in the vehicle.  The marijuana had been carefully wrapped and vacuum sealed and stored in a large plastic bin. Victim 1 stated that he was transporting the marijuana for another person and that the cash was his that he earned through driving a taxi.  TATUM asked Victim 1 what kind of marijuana it was.

Victim 1 stated he did not have paperwork for the marijuana.  TATUM informed Victim 1 they were seizing the cash and the 14 pounds of marijuana.  As Victim 1 was explaining the money was for a gift for his wife, TATUM told Victim 1 "there is no such thing as easy money."  Victim 1 provided Officer 1 with his identification, which had his address on it.  Shortly after that, it appears that TATUM turned off his body-worn camera.  Victim 1 reported that TATUM took the cash and marijuana, and placed it in the police vehicle.  Victim 1 reported that he asked TATUM if he [Victim 1] could have any proof that he was stopped, and TATUM responded "you can have your freedom today," or words to that effect.  Victim 1 also stated that the marijuana was purchased for $1,600 per pound, for a total purchase price of approximately $22,400.

24.    Victim 1 was not arrested, he was not given any paperwork related to the seizure of the cash, he was not given a citation for the marijuana, and he was not provided with a card or any other documentation that related to the stop.  He was not given an opportunity to contest the seizure of the cash or marijuana.  The FBI reviewed all documentation produced by RPDPS related to police stops by TATUM and Officer 1 during this timeframe, as well as documentation for a stop in relation to Victim 1, and there are no reports memorializing the RPDPS stop, the seizure, or that either the cash or the 14 pounds of marijuana seized from Victim 1 were submitted into property/evidence, even as found property.  No Incident/Investigation Report, Evidence/Property Report, or Destruction Order was prepared for this incident.  Subsequent investigation relating to this stop by RPDPS has revealed that no documentation exists in its records relating to this stop or this victim, with the exception of the body-worn camera recording and an entry of a license plate associated with Victim 1 on an Event Chronology log.

*September 2, 2016 Stop*

25.    On or about September 2, 2016, TATUM and Officer 1, while on duty and in a police vehicle, stopped Victim 2 (T.M.) on Highway 101 near Cloverdale, California.  During the course of the stop, which was recorded in part on TATUM's body-worn camera, TATUM and Officer 1 discovered roughly 15 pounds of marijuana in the vehicle.  The marijuana was in

individually wrapped clear bags stored in a large dark green plastic bag.  Shortly after the discovery of the marijuana, TATUM's body-worn camera recording ends.   However, according to Victim 2, following the discovery of the marijuana, TATUM told him that TATUM and Officer 1 could either "take him or take the marijuana."  Victim 2 reported that he did not give consent for the search and that he had a medical marijuana card.  Victim 2 stated that TATUM and Officer 1 took the marijuana and that it had a value at the time of approximately $2,000 per pound, with a total value of approximately $30,000.

26.      Victim 2 was not arrested, he was not given a citation for the marijuana, and he was not provided with a card or any other documentation that related to the stop.  He was not given an opportunity to contest the seizure of the marijuana.  The FBI reviewed all documentation produced by RPDPS related to police stops by TATUM and Officer 1 during this timeframe, as well as documentation for a stop in relation to Victim 2, and there are no reports memorializing the RPDPS stop, the seizure, or that the marijuana seized from Victim 2 was submitted into property/evidence, even as found property.  No Incident/Investigation Report, Evidence/Property Report, or Destruction Order was prepared for this incident.  Subsequent investigation relating to this stop by RPDPS has revealed that no documentation exists in its records relating to this stop or this victim, with the exception of the body-worn camera recording.

*October 4, 2016 Stop*

27.      On October 4, 2016, TATUM and Officer 2, while on duty and in a police vehicle on patrol, stopped Victim 3 (J.D.) near Cloverdale.  Victim 3 was a passenger in a rental vehicle.  During the course of the stop, which was recorded in part on TATUM's body-worn camera, TATUM and Officer 2 discovered roughly six pounds of marijuana stored in a carbon-lined bag in the vehicle.  After discovering six pounds of marijuana in Victim's 3's vehicle, TATUM and Officer 2 gave Victim 3 an ultimatum: A, give him a citation have him appear in court for possession of marijuana and it gets destroyed; or B, TATUM and Officer 2 still book the marijuana in and it still gets destroyed.  Victim 3 consented to allow TATUM and Officer 2 to

10

seize the marijuana and not contest the seizure, in order to avoid an arrest and charges.  Officer 2 obtained Victim 3's identification which contained his address and told Victim 3 that if he came back to contest the seizure, they had his identification and address and could send a report to the DA to file charges against him.  Shortly after this exchange, the body worn camera was terminated.  However, according to Victim 3, he told TATUM and Officer 2 that he may come in with the appropriate paperwork the next day in an attempt to reclaim his marijuana.  Officer 2 responded that Victim 3 should not bother because the marijuana would already be destroyed by then.  Victim 3 reported that TATUM and Officer 2 seized the marijuana and put it in their police vehicle.  Victim 3 estimated that the value of the marijuana at a medical marijuana dispensary was $2,500 per pound at that time and that he had paid half that amount for it.  Thus, the value was at least $7,500.

28.     Victim 3 was not arrested, he was not given a citation for the marijuana, and he was not provided with a card or any other documentation that related to the stop.  He was not given an opportunity to contest the seizure of the marijuana.  The FBI reviewed all documentation produced by RPDPS related to police stops by TATUM and Officer 2 during this timeframe, as well as documentation for a stop in relation to Victim 3, and there are no reports memorializing the RPDPS stop, the seizure, or that the marijuana seized from Victim 3 was submitted into property/evidence, even as found property.  No Incident/Investigation Report, Evidence/Property Report, or Destruction Order was prepared for this incident.  Subsequent investigation relating to this stop by RPDPS has revealed that no documentation exists in their records relating to this stop or this victim, with the exception of the body-worn camera recording.

*October 25, 2016 Stop*

29.     On or about October 25, 2016, TATUM and Officer 2, while on duty and in a police vehicle on patrol, stopped Victim 4 (D.P.) near Cloverdale, California.  Victim 4 was driving a rental vehicle.  During the course of the stop, which was recorded in part on TATUM's body-worn camera, before searching the vehicle, TATUM asked if Victim 4 had any money.

11

TATUM and Officer 2 then searched the vehicle and discovered marijuana in a shipping box containing another box wrapped as a birthday present.  Officer 2 told Victim 4 that Victim 4 would not go to jail and TATUM declared that Officer 2 and TATUM would seize the marijuana, which TATUM estimated was approximately two-and-a-half to five pounds in weight, destroy it, and let Victim 4 go.  Victim 4 claimed that he did not know that the marijuana was inside the box.  Before the incident with Victim 4 was completed, TATUM's body-worn camera recording ends.  However, according to Victim 4, TATUM and Officer 2 seized the marijuana and put it in their police vehicle.

30.     Victim 4 was not arrested, he was not given a citation for the marijuana, and he was not provided with a card or any other documentation that related to the stop.  The FBI reviewed all documentation produced by RPDPS related to police stops by TATUM and Officer 2 during this timeframe, as well as documentation for a stop in relation to Victim 4, and there are no reports memorializing the RPDPS stop, the seizure, or that the marijuana seized from Victim 4 was submitted into property/evidence, even as found property.  No Incident/Investigation Report, Evidence/Property Report, or Destruction Order was prepared for this incident.  Subsequent investigation relating to this stop by RPDPS has revealed that no documentation exists in their records relating to this stop or this victim, with the exception of the body-worn camera recording.

## C.     Post-Interdiction Team Stops and Seizures Without Body Worn Camera Videos and Impersonating ATF

*December 5, 2017 Stop*

31.     Almost a year after the interdiction team's operations were terminated in roughly January 2017, on or about December 5, 2017, at approximately noon, two individuals, who were later identified as TATUM and HUFFAKER, conducted a traffic stop of Victim 5 (E.F.).  As set forth below, at the time of the stop, TATUM and HUFFAKER were driving an unmarked black SUV.  Victim 5 recalled TATUM and HUFFAKER wearing tactical style clothing with patches indicating "police" but no badges identifying them as RPDPS officers or reflecting any other law

enforcement department or agency.   At the time of the stop, Victim 5 was driving a rented white KIA SUV, on Highway 101 southbound, while in Mendocino County, near the Sonoma-Mendocino County border.  The location of the stop was in Mendocino County near the Sonoma County border.  This stop was not recorded by a body-worn camera, but Victim 5 remembered the stop.  Victim 5 reported that Officer A (TATUM) searched the vehicle.  Although Victim 5 did not identify Officer A as TATUM, TATUM identified himself as the officer who conducted the search through the partially false Incident/Investigation Report he prepared on February 20, 2018, as discussed below.

32.     During the search, in a cardboard box, Officer A (TATUM) found three sealed one-pound bags of marijuana.  Officer B, who Victim 5 later identified as HUFFAKER, had Victim 5's identification and asked if his address was current.  I interviewed Victim 5 and during the interview I showed him a series of four unmarked photographs of individuals.  Victim 5 positively identified the photograph of HUFFAKER as Officer B.  Officer B (HUFFAKER) told Victim 5 that the officers were with the ATF.  As set forth above, ATF had no interdiction operations with RPDPS, including TATUM and HUFFAKER.  Victim 5 reported that Officer A (TATUM) took the marijuana and put it in the black SUV and then told Officer B (HUFFAKER) to take a picture of Victim 5's license plate and driver's license.  Victim 5 reported that as the officers left in the black SUV, Officer B (Huffaker) told him that he may be getting a letter from Washington.  Victim 5 reported that the marijuana was valued at $1,000 per pound.  Thus, the total value for the marijuana was at least $3,000 total.

33.     Victim 5 was not arrested, he was not given a citation for the marijuana, he was not provided with a card or any other documentation that related to the stop.  RPDPS found no record of the stop or any records reflecting that the marijuana was submitted into property/evidence, even as found property.  No RPDPS Incident/Investigation Report was prepared, with the exception of the falsified Incident/Investigation Report, as discussed below.

13

*December 18, 2017 Stop*

34.     A little less than two weeks later, or about December 18, 2017, at approximately noon, TATUM and another officer, while in an unmarked black SUV and without police uniform identifying themselves as RPDPS, stopped Victim 6 (B.L.), who was driving a white Mercedes SUV, southbound on Highway 101, while in Mendocino County, near the Sonoma-Mendocino County border.  Victim 6 stated that the vehicle was new at the time and did not yet have permanent license plates.  This stop was not recorded by a body-worn camera.  Victim 6 reported the officers identified themselves as ATF agents.  Victim 6 reported having approximately 23 pounds of marijuana, packaged in one-pound bags and labeled with a date and type of strain that he was bringing to a dispensary lab for testing in the San Francisco Bay Area.  He estimated the value at $1,000 per pound, with a total value of $23,000.  He also had approximately four crates of marijuana hash that was similarly marked.  Victim 6 reported that the officers told him that he had two options: they could either seize the marijuana and let him go, or they could seize the marijuana, the hash, and take him into the station.  Victim 6 reported that he had valid paperwork, including an inventory spreadsheet for the marijuana and hash.  When Victim 6 asked for official documentation regarding the seizure, one officer replied by asking if Victim 6 wanted to "make a federal case out of it," or words to that effect.  Victim 6 reported that TATUM and the other officer left with the marijuana.  Victim 6 identified one officer from the incident – TATUM.

35.     Victim 6 was not arrested, he was not given a citation for the marijuana, and he was not provided with a card or any other documentation that related to the stop.

36.     Each of these seizures of marijuana affected interstate commerce.

**D.     Falsified Police Report to Conceal Scheme**

37.     On December 19, 2017, at 3:22 p.m., an Event Chronology reflects a request from TATUM to dispatch for a case number related to "found property."  RPDPS dispatch accordingly generated case number 170005373.  Chain of custody documents, using that case number, show TATUM physically submitted two separate items, each described at 15 pounds of

marijuana, to Evidence/Property on December 19, 2017 at approximately 3:31 p.m.  However, an Evidence/Property Report indicates two 15-pound boxes of marijuana were submitted on December 18, 2017, to Property as "Found – for Destruction."  The Report indicates it was collected by HUFFAKER on December 18, 2017.

38.     The FBI reviewed the two boxes that were stored in RPDPS's Evidence/Property room associated with 170005373.  The boxes contained loose dried marijuana bud.  No containers of concentrated marijuana hash or any individually bagged marijuana were in the boxes.  Victim 6 was shown pictures of the cardboard boxes and its contents and did not recognize the boxes and advised that he would never package loose marijuana in a cardboard box as doing so is unhygienic.  Even though the evidence I viewed was not consistent with what was seized from Victim 6, I believe case number 170005373 was generated for Victim 6's stop based on the timing and sequencing as captured by the Event Chronology, Chain of Custody, and Property/Evidence Report.

39.     As discussed above, case number 17-0005373 was generated on December 19, 2017, at 3:23 p.m.  No Incident/Investigation Report was created using that case number until February 20, 2018.

40.     On or about February 11, 2018, an investigative reporter, Kym Kemp, published two articles about the events related to the seizure of marijuana from Victim 5 on a website called "Redheaded Blackbelt" that covers news stories in Mendocino, Humboldt and Trinity counties.  One article was entitled, "Outraged: One Man's Two Month Quest from the FBI to the ATF to Expose What He Says Are Corrupt Police Officers in Mendocino."  The other article was entitled "Former Undercover Officer Involved in Developing Cannabis Products Accuses Hopland Tribal Police Chief of Theft, Corruption, and Civil Rights Violations."  In these articles, Kemp reported that Victim 1 stated that he had been robbed of three pounds of marijuana by two unidentified officers without uniforms and believed it may have been the Hopland Tribal Police or the Mendocino County Sheriff's Office.  Both articles state that Victim 5 had contacted and

been contacted by the FBI.  Both articles also state the ATF began an investigation into the matter after being contact by Victim 1.

41.     Prior to February 13, 2018, TATUM told Commander J.T. that there was a female reporter up north writing articles linking a stop to the Mendocino County Sheriff's office and the Hopland Tribal police.  TATUM clarified that it was actually an interdiction stop conducted by RPDPS and that he wanted to correctly identify the law enforcement agency responsible for the stop and asked J.T. if he could issue a press release.  Commander J.T. agreed that it was appropriate.

42.     On or about February 13, 2018, TATUM issued a press release from RPDPS claiming responsibility for the stop of a white SUV in December 2017 near the Sonoma-Mendocino border and stating it was a lawful stop that was done by RPDPS officers.

43.      It was not until on or about February 20, 2018, after the news articles described above reported federal investigation into the seizure from Victim 5, that TATUM wrote an Incident/Investigation Report regarding Victim 5's traffic stop and seizure, which occurred on December 5, 2017.  Rather than pull a new case number on February 20, 2018, TATUM used an existing case number, 17-0005373, to document Victim 5's stop.  As discussed, above case number 17-0005373 was originally generated on December 19, 2017, related to Victim 5's stop.

44.     Although TATUM identified Victim 5 in the "offender" section of the report, TATUM's narrative recounted facts specific to Victim 6's traffic stop.   For example, TATUM reported that he stopped Victim 5 in a Mercedes SUV, not a KIA SUV.  TATUM reported that the Mercedes did not have a license plate, when in fact the KIA that Victim 5 was driving did have a license plate, and TATUM asked HUFFAKER to take a photo of it.  TATUM reported that Victim 5 had a "homemade excellent spreadsheet," when in fact it was Victim 6 that showed TATUM a spreadsheet documenting the marijuana in the vehicle.  TATUM also reported that Victim 5 was in the possession of "approximately 30 pounds [of marijuana that] was located along with several hundred containers of concentrated marijuana hash," when Victim 5 actually

reported having only three pounds of marijuana. In fact, this description and quantity was more closely aligned with what was located in Victim 6's vehicle.

45.     Based on these facts, there is probable cause to believe that TATUM falsified a report for the undocumented stop and seizure of marijuana from Victim 5 in order to conceal his and HUFFAKER's actions during the stop and deflect negative media attention. As a result, there is probable cause to believe that he falsified a record or document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter that he knew was within the jurisdiction of the FBI and ATF.

### E.     TATUM's Evasion of Income Taxes

46.     Special Agents of the IRS-CI conducted an investigation of the federal income tax liability of TATUM for the calendar year 2016. As part of this investigation, agents examined TATUM's joint 2016 tax return, interviewed third persons having knowledge of the taxpayer's financial condition, and reviewed relevant financial records. Based on this investigation, I learned from the IRS-CI Special Agents that TATUM omitted taxable income from his tax return for the calendar year 2016 and took affirmative acts to evade and defeat tax due and owing. By omitting taxable income from the tax return, the tax due and owing was understated, and the correct amount of tax was not reported to the IRS.

47.     As part of the investigation, IRS-CI Special Agents reviewed and analyzed the following bank accounts from January 1, 2013 through September 30, 2019:[1]

a. Wells Fargo Account ending -4069, held in the name of Brendon TATUM;

b. Wells Fargo Account ending -2740, held in the name of Brendon TATUM;

c. Wells Fargo Account ending -7872, held in the name of Brendon TATUM and E.S. (TATUM's child or step-child);

d. Redwood Credit Union Account ending -7926, held in the name of K.T. (TATUM's wife);

---

[1] Bank records for Wells Fargo Account ending -2740 ended in January 2017.

e.  Wells Fargo Account ending -2509, held in the name of K.T.;

f.  Wells Fargo Accounting ending -6792, held in the name of K.T.;

g.  Bank of America account ending -3562, held in the name of TATUM's mother and stepfather.

48.     For the 2016 tax year, the IRS-CI Special Agents' analysis identified a total of $396,224 in cash deposits made in bank accounts controlled by TATUM and/or his wife, and his mother and stepfather's account.  Specifically, in the 2016 calendar year, the IRS-CI Special Agents' analysis found that TATUM made cash deposits into his accounts in the amount of $118,770.  During that same time, cash deposits in the amount of $177,744 were made into his wife's accounts.  Additionally, in 2016, cash deposits of $99,710 were made into an account in the name of his mother and stepfather.  None of the above-described cash deposits exceeded $10,000.  Of these cash deposits into TATUM and his wife's bank accounts in 2016, there were eight, same-day or consecutive-day cash deposits not exceeding $10,000, totaling $159,900.

49.     By structuring the deposits below $10,000, TATUM and his wife were able to avoid the filing of a Currency Transaction Report (hereinafter "CTR").  Pursuant to 31 U.S.C. § 5313, and regulations thereunder, including 31 C.F.R. §§ 103.22, 103.27, and 103.28, domestic financial institutions are generally required to prepare and submit CTRs to report transactions involving over $10,000 in currency every time they occur at the bank.  Based on my conversations with IRS-CI Special Agents, I know that "structuring" of currency into bank accounts in amounts under $10,000 is a common method of narcotics traffickers, money launderers, and income tax evaders as they seek to avoid scrutiny of law enforcement for conducting voluminous amounts of cash transactions.

50.     An example of TATUM's overt efforts to structure his cash deposits happened on March 22, 2017, when TATUM attempted to deposit over $10,000 into his Wells Fargo Account ending -4069 at the Wells Fargo Rohnert Park, California branch.  TATUM then took back $1,000 and only deposited $9,380 in currency.  Based on interviews with the Wells Fargo Anti-Money Laundering Unit and the teller who conducted the transaction, it is apparent that TATUM

took back the $1,000 in an attempt to avoid the filing of a CTR. The teller who received the cash from TATUM logged the following information into the Wells Fargo internal system immediately after TATUM came into the branch and deposited only $9,380 in cash:

> CUSTOMER CAME IN WITH TENTHOUSAND (sic) THREE HUNDRED EIGHTY IN CASH AND STRUCTURED IT DOWN TO NINE THOUSAND THREE HUNDRED EIGHT BY ASKING FOR MONEY BACK NOT SURE IF HE MENT (sic) TO STRUCTURE IT BUT ORIGINAL AMOUNT WAS OVER TEN THOUSAND.

51.     In addition to the analysis of TATUM, his wife, and his mother's bank accounts, IRS-CI Special Agents reviewed sales documents related to TATUM's purchase of a Duckworth 30 Offshore fishing boat to identify additional sources of cash that were received by TATUM but not deposited into one of the above-listed bank accounts. Sales records revealed that TATUM purchased the fishing boat on November 10, 2016 for a total price of $218,234.61. TATUM used a total of $46,835 in cashier's checks the purchase of which were not found in a review of financial records of known bank accounts for TATUM, his wife, and mother. I know from my training and experience that cashier's checks can be purchased with cash, and as a result, there is probable cause to believe that the boat was purchased with cashier's checks that were purchased with cash that was not previously deposited into TATUM's bank accounts.

52.     The below chart summarizes IRS-CI Special Agents' analysis for the 2016 tax year showing cash deposits into TATUM's, his wife's and his mother's bank accounts, as well as the use of cash that was never deposited into a bank to purchase his boat in 2016. In summary, the cash deposits into TATUM's, his wife's, and his mother's bank accounts, along with the cash used to purchase the fishing boat, totaled $443,059.[2]

---

[2] The IRS-CI Special Agents identified a total of $12,920 of cash withdrawals from the above identified bank accounts in 2016. These cash withdrawals were assumed to be re-deposited by TATUM. Therefore, to be conservative, the total cash deposits into TATUM's bank accounts was decreased by $12,920 in any additional tax due and owing computations provided by IRS-CI Special Agents.



53. As shown in the above chart, the cash deposits into these bank accounts increased significantly from 2015 through 2017, which is the time period when TATUM and others were taking marijuana (and in at least one instance, cash) from drivers without booking the seized items into evidence. Notably, the cash deposits decreased significantly after TATUM resigned from the Rohnert Park Police Department in June 2018.

54. On April 15, 2017, TATUM and his wife filed a joint Form 1040 income tax return for the calendar year 2016. This return was submitted electronically by their tax return preparer from Petaluma, California.

55. A review of TATUM's 2016 tax return showed no reported gross receipts commensurate with a cash intensive business that was depicted by the regular and continuous deposits into TATUM's bank accounts. Other than TATUM's and his wife's gross wages of $128,992 and $29,722 respectively (which were not paid in the form of cash), TATUM reported only $9,700 of gross receipts on his 2016 tax return.[3] TATUM reported on his tax return that

---

[3] Less than $100 of taxable interest and dividends were reported on the 2016 tax return. A taxable refund, credit, or offset of state and local income tax of $19,066 was also reported on the 2016 tax return.

these gross receipts were associated with TATUM's barbeque business and guide service business, which he has owned since at least 2013 through 2018. Between 2013 and 2018, TATUM has never reported over $10,000 in gross receipts for either business. TATUM did not provide evidence of the cash receipts totaling $443,059 to his tax return preparer for his 2016 tax return, which was filed for both TATUM and his wife jointly. Based on the unreported cash receipts of $443,059, TATUM owes an additional $146,701 to the IRS for the 2016 tax year. He previously reported a $2,033 refund for the 2016 year.

56.     Based on the above information and the bank account and tax return analysis provided to me by IRS-CI Special Agents, there is probable cause to believe that TATUM did unlawfully and willfully attempt to evade and defeat the income taxes due and owing by him to the United States of America for the calendar year 2016.

## IV.     CONCLUSION

57.     Based upon the information contained within this Affidavit, I submit that there is probable cause to believe that Brendon Jacy TATUM and Joseph HUFFAKER conspired to commit extortion under color of official right, in violation of 18 U.S.C. § 1951. In addition, I submit that there is probable cause to believe that Brendon Jacy TATUM engaged in falsifying records in a federal investigation, in violation of 18 U.S.C. § 1519, and tax evasion, in violation of 26 U.S.C. § 7201.

//

//

//

//

//

//

//

21

## V.      REQUEST FOR SEALING

58.      Because this investigation is ongoing, disclosure of the Complaint, Affidavit, and other related filings will jeopardize the progress of the investigation by apprising TATUM and HUFFAKER's associates of the existence of the charges and provide them with an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee from prosecution. Accordingly, I request that the Complaint, Affidavit, and other related filings be filed under seal until further Order of this Court.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

William Bradford Roberts
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____March 9_____, 2021.

HON. HONORABLE SALLIE KIM
United States Magistrate Judge